UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER LYNN ZAHARIDES,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　　Defendant. | Case No.: 1:14-cv-00283 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF, CHRISTOPHER LYNN ZAHARIDES |

Plaintiff Christopher Zaharides asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") erred in evaluating the credibility of his subjective complaints. Because the ALJ applied carried his duty to identify clear and convincing reasons for rejecting Plaintiff's credibility, the ALJ's decision is **AFFIRMED**.

I.   **Background**

Plaintiff filed applications for benefits on March 3, 2011, alleging disability beginning June 6, 2009. (Doc. 12-3 at 16.) The Social Security Administration denied his claims initially and upon reconsideration. (Doc. 12-5 at 2-15.) Plaintiff requested a hearing, and testified before an ALJ on September 14, 2012. (Doc. 12-3 at 37.) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on February 22, 2013. (*Id.* at 13.) The

Appeals Council denied Plaintiff's request for review. (*Id.* at 6-8.) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## II. Standard of Review

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## III. Disability Benefits

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## IV. Administrative Determination

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A. Relevant Medical Evidence

Dr. Kalyani Shah performed a gastroenterology consultation on July 15, 2008. (Doc. 12-8 at 2.) He noted Plaintiff had been complaining of "lower abdominal pain for one month or so," and a CT scan performed at an emergency room showed diverticulitis. (*Id.*) In June 2009, Plaintiff was admitted to Community Regional Medical Center for "an elective sigmoid colectomy" to treat his recurrent diverticulitis. (*Id.* at 26.) At the hospital prior to surgery, Plaintiff reported he had "a previous seizure disorder," but "[h]is last seizure was 4-5 years ago" and he no longer took medication for it. (*Id.* at 46.) Plaintiff reported he "still ha[d] an occasional absence seizure but ha[d] not had a grand mal seizure for approximately five years." (*Id.*) After the surgery, Plaintiff was discharged with the instructions to go "on a low residual diet" and to "not lift anything over 10 pounds for 6 weeks." (*Id.* at 27.) At post-operative follow-ups in August and October 2009, Plaintiff was "doing well." (*Id.* at 19-20.)

In February 2010, Plaintiff reported he had twisted his left knee and felt moderate to severe pain. (Doc. 12-8 at 23.) An x-ray showed "slight narrowing of the medial compartment of the femoral-tibial joint space" and "early subchondral sclerosis along the medial tibial plateau." (*Id.* at 25.) There was "[n]o evidence of acute bony injury," but Plaintiff had "[v]ery early degenerative changes. (*Id.*) Plaintiff continued to report severe pain, and an MRI taken in April 2010 showed a "[h]orizontal cleavage tear of the posterior horn of the medial meniscus with extension to the body of the medial meniscus." (*Id.* at 84-85.)

In April 2010, Plaintiff reported "2 events . . . described as whole body shaking and loss of

3

consciousness lasting about 1 minute." (Doc. 12-8 at 22.) Plaintiff had an electroencephalogram that Dr. Perminder Bhatia determined was abnormal and showed "possible discharging focus" in Plaintiff's right temporal lobe. (*Id.*)

Plaintiff visited the Sammarian Medical Group to establish care on April 27, 2010. (Doc. 12-8 at 115-18.) Plaintiff said "he was diagnosed with epilepsy as a teenager and . . . had seizures on and off since then." (*Id.* at 118.) According to Plaintiff, he was on medication "for many years," but had "not taken it for more than 5 yrs now because he ha[d] not seen an MD to refill it." (*Id.*)

On May 13, 2010, Plaintiff had an MRI on his left shoulder after reporting "shoulder pain for months." (Doc. 12-8 at 87.) The MRI showed there were "no significant degenerative changes," but Plaintiff had a "[p]artial articular surface tear of the supraspinatus tendon." (*Id.*)

In June 2010, Plaintiff reported that he suffered a recent injury to his right knee. (Doc. 12-9 at 48.) Dr. Diana Artenian determined an x-ray of Plaintiff's right knee showed he had "[l]arge suprapatellar joint effusion" and "small lesions in the proximal tibial and fibular diametaphsis suggestive of a benign bone island and a fibrous cortical defect respectively." (Doc. 12-8 at 82.)

In July 2010, Plaintiff "complain[ed] of being depressed and anxious." (Doc. 12-9 at 47.) He said he felt the same way "years ago" and was diagnosed with depression, and Plaintiff had been taking antidepressants since that time. (*Id.*)

Plaintiff had surgery on his right knee on September 15, 2010. (Doc. 12-8 at 96.) The surgeon, Dr. Shantharam, noted Plaintiff had "a big complex tear of the medial meniscus." (*Id.*) At the post-operative orthopedic examination, Plaintiff reported his "last seizure . . . was about one and half years ago." (Doc. 12-9 at 5.) In October 2010, Plaintiff said his knee was "not nearly as sore" as it had been, and he was using "just one crutch for in case he needed some extra stability." (*Id.* at 9.) Plaintiff was referred to physical therapy and told to "continue to increase his activity as tolerated and take his pain medication if needed." (*Id.* at 9-10.)

In early February 2011, Dr. Shantharam noted Plaintiff was "pretty happy with his right knee" and was "requesting surgery for his left knee." (Doc. 12-9 at 6.) Dr. Shantharam performed surgery on Plaintiff's left knee on February 23, 2011. (Doc. 12-8 at 109.) Plaintiff had "a huge big complex tear involving the posterior horn medial meniscus." (*Id.*) The day after his left knee surgery, Plaintiff

suffered a seizure that was witnessed by an unknown individual. (Doc. 12-8 at 111.) He lost consciousness for approximately three minutes, and showed signs of confusion after the seizure when he went to the emergency room. (*Id.*) Plaintiff had CT scans with and without contrast, which showed was no evidence of right mesial temporal sclerosis. (*Id.* at 83.)

Dr. Mary Lewis performed a consultative psychiatric evaluation on May 27, 2011. (Doc. 12-9 at 34-39.) Dr. Lewis noted that when she asked Plaintiff "his reason for applying for SSI benefits, he did not report any psychological distress." (*Id.* at 38.) Rather, Plaintiff reported that he had pain in his shoulder and knees, which he described as "achy" and a "three" on "a scale of 1-10." (*Id.* at 34.) He admitted to "consuming alcohol at the age of 16 through 20 and smoking marijuana at the age of 16 through 20," as well as "smoking methamphetamine at the age of 18 through 27 and smoking crack cocaine at the age of 23 through 26." (*Id.* at 35.) Plaintiff told Dr. Lewis that he stopped working because he had stomach surgery, and he was "not willing to work in any job position, [was] not actively seeking employment and [was] not involved in a retraining program." (*Id.*)

Plaintiff described his normal day to Dr. Lewis as follows: "I get up, have a cigarette and a cup of coffee and sit in the front yard. I do a little chores." (Doc. 12-9 at 38) He clarified that his chores included, "washing dishes, cooking and laundry" and his hobbies included "playing poker and Facebook games on the computer." *Id*. He reported having "several friends with whom he is close to and has known [ ] for 23 years." *Id.*

After examination, Dr. Lewis found Plaintiff's "capacity to act purposefully, to think rationally, and deal effectively with his environment [was] not significantly impaired." (Doc. 12-9 at 36.) She determined Plaintiff's recent memory recall was "satisfactory based on the [his] ability to successfully recall all three items after five minutes." (*Id.* at 37.) Further, Plaintiff's attention and concentration was "satisfactory based on [his] ability to successfully count by 2s to 20 and back to zero." (*Id.* at 38.) Dr. Lewis concluded Plaintiff was "not significantly limited" with his ability to understand and remember either very short and simple or detailed instructions, to maintain concentration and assistance, and compete a normal workday and workweek. (*Id.* at 39.)

Dr. Tomas Rios performed a comprehensive internal medicine evaluation on June 3, 2011. (Doc. 12-9 at 40-44.) Plaintiff reported suffered from pain in his shoulders and knees. (*Id.* at 40.) He

5

said that after his knee surgeries, "he regained some strength and the pain [was] slightly diminished," but he still had "some difficulty with any prolonged standing and climbing." (*Id.* at 40.) In addition, Plaintiff reported that he had a "history of seizure disorder since childhood" that were "grand mal in presentation with occasional aura and post ictal state lasting for 30 minutes to four hours." (*Id.*) He told Dr. Rios his episodes had "increased in frequency" over the last eight months, and he was suffering from seizures "about once a week." (*Id.*) Plaintiff reported he "can only help within minimal household chores." *Id*. at 41.

Dr. Rios observed that Plaintiff was able to "move[] about the room with minimal difficulty." (Doc. 12-9 at 41.) He determined Plaintiff's motor strength was "4/5 in the upper extremities, limited on account of the pain in both shoulders" and "5/5 in the lower extremities." (*Id.* at 43.) Dr. Rios concluded Plaintiff was able to stand and walk up to six hours; sit up to six hours; lift and carry "20 pounds occasionally and 10 pounds frequently;" and occasionally climb, balance, stoop, kneel, crouch, and crawl "on account of the underlying problem to both knees." (*Id.* at 43-44.) Dr. Rios believed Plaintiff had manipulative limitations "on account of the rotator cuff tendinitis to both shoulders," and should be limited to "occasional reaching and frequent handling, feeling and fingering." (*Id.* at 44.) Further, Dr. Rios opined Plaintiff "should be precluded from working at heights and around heavy machinery on account of his history of seizure disorder." (*Id.*)

On June 14, 2011, Plaintiff visited Sammarian Medical Group, where he requested that his current seizure medication be discontinued and that he be given a prescription for Dilantin, the medication "he was on as a child into young adult-hood." (Doc. 12-9 at 45.) He also complained of left "shoulder pain resulting from injury [when] falling down during [an] episode of seizure." (*Id.*)

Dr. Deborah Hartley completed a psychiatric review technique form on June 22, 2011, and opined Plaintiff's mental impairments were "not severe." (Doc. 12-0 at 49.) Dr. Hartley determined Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 59.) Dr. Hartley noted that Plaintiff's "limitations appear to be primarily due to reported medical concerns" and he "appear[ed] to be able to function adequately from a mental health perspective." (*Id.* at 60.)

6

1 | Dr. Kenneth Wainner completed a physical residual functional capacity assessment on July 6,
2 | 2011. (Doc. 12-9 at 63 to 71.) Dr. Wainner noted Plaintiff suffered from a seizure disorder and rotator
3 | cuff tendonitis, and had arthroscopic surgeries on his knees. (*Id.* at 63.) He believed Plaintiff was able
4 | to lift and carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk about six hours in
5 | an eight-hour day, and sit about six hours in an eight-hour day. (*Id.* at 64.) Dr. Wainner opined Plaintiff
6 | was able to frequently balance and stoop; occasionally kneel, crouch, crawl, and climb ramps or stairs;
7 | but never climb ladders, ropes, or scaffolds. (*Id.* at 65.) He explained that due to the seizure disorder,
8 | Plaintiff needed "to avoid unprotected heights and dangerous machinery." (*Id.* at 65, 67) In addition,
9 | Plaintiff's reaching was "limited secondary to rotator cuff tendinitis in both shoulders." (*Id.* at 66.)
10 | Therefore, Dr. Wainner concluded a limitation to light work "with environment restrictions due to
11 | seizure seem[ed] appropriate." (*Id.* at 70.) The assessment was affirmed by Dr. Roger Fast. (*Id.* at 121.)

12 | Dr. Archimedes Garcia reviewed the record and provided a case analysis on October 24, 2011.
13 | (Doc. 12-9 at 120.) Dr. Garcia noted that despite the fact that Plaintiff was reporting worsening of his
14 | mental impairment and "difficulty understanding directions and focusing for long periods of time," Dr.
15 | Lewis had determined Plaintiff had "satisfactory attention and concentration and he was able to
16 | complete a three-step command." (*Id.* at 121.) Further, Dr. Garcia opined Plaintiff's activities of daily
17 | living were "not supported by his [consultative examination] findings." (*Id.*) He agreed with Dr. Lewis'
18 | conclusion that Plaintiff's mental impairments were not severe. (*Id.*) He found Plaintiff only "partially
19 | credible considering the alleged worsening of his impairments are not fully supported by the objective
20 | medical evidence." *Id.*

21 | On March 1, 2012, Plaintiff visited Clinica Sierra Visita to establish care. (Doc. 12-10 at 10.)
22 | He reported that he had a history of seizures and pain in his left shoulder and neck, as well as anxiety
23 | and depression. (*Id.*) Plaintiff's wife reported that he had seizures three times in the past month that
24 | lasted "3-5 minutes." (*Id.*) On March 30, he reported he had "approx. 2-3 seizures since [his] last
25 | visit." (*Id.* at 9.)

26 | In July 30, 2012, Plaintiff requested "mental & physical capacity evaluation forms" be
27 | completed for his "S.S.I. hearing." (Doc. 12-10 at 3.) Plaintiff received a referral to Dr. Alexia Baca
28 | for a mental capacity evaluation. (*Id.*) Plaintiff told Dr. Baca that he was "unable to maintain steady

employment," had "multiple seizures & multiple surgeries," and he had "learning disabilities." (Doc. 12-9 at 130.) Dr. Baca opined that Plaintiff had "fair" concentration, judgment, insight, and impulse control. (*Id.* at 131.) She diagnosed Plaintiff with major depressive disorder and ADHD. (*Id.*) Dr. Baca gave Plaintiff a GAF score of 60.[1] (*Id.*)

Dr. Baca completed a mental residual functional capacity questionnaire on August 24, 2012. (Doc. 12-9 at 125-128.) She opined Plaintiff was "seriously limited, but not precluded" from understanding, remembering, and carrying out very short and simple instructions. (*Id.*) According to Dr. Baca, Plaintiff was "unable to meet competitive standards" with maintaining attention for two-hour segments or attending work regularly and being punctual. (*Id.*) Dr. Baca opined Plaintiff was unable to understand, remember, and carry out detailed instructions. (*Id.* at 126.) She supported these opinions by noting Plaintiff had "a lengthy history of treatment for ADHD," as well as the fact that Plaintiff "was in special education" and "couldn't transition to the regular class room [sic]." (*Id.* at 127.)

### B.    Administrative Hearing Testimony

Plaintiff testified before the ALJ on September 14, 2012. (Doc. 12-3 at 37.) He reported that he completed the ninth grade in high school and studied electronics for a semester at Fresno City College. (*Id.* at 40.) Plaintiff reported he was last employed at Wal-mart Tire and Lube Express, where he changed oil. (*Id.*) Plaintiff said he previously installed garage doors "for about a year," and worked as a cashier for Ride Aid and In-N-Out. (*Id.* at 40-42.) Plaintiff believed he was no longer able to work and had "a really hard time being able to get up on an everyday basis" due to epilepsy, stomach problems, difficulty "staying on task and concentrating," pain in his left shoulder, and issues with his left knee. (*Id.* at 42-44.)

He reported that he had "a lot of stomach problems and issues with pains that need surgeries, but the surgeon won't touch [him] because . . . [he] had two seizures during the [last] surgery." (Doc. 12-3 at 42.) Also, Plaintiff said surgery was recommended to correct a tear in his left shoulder. (*Id.* at

---

[1] Global Assessment Functioning ("GAF") scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.* at 34.

43.) Plaintiff said he needed "to have something done with [his] left knee as well again" because the day after surgery, he had another seizure and he thought he "screwed something else up in it." (*Id.* at 43-44.)

Plaintiff said he had an average of one seizure per year. (Doc. 12-3 at 44.) He confirmed that in 2009, he reported he was not taking seizure medication, and that in April 2010, he reported he had not been doing so for many years. (*Id.*) Plaintiff said he was currently having two grand mal seizures per month, which were observed by everyone in his family. (*Id.* at 46-47.)

He testified that he lived with his wife and six school-aged children. (Doc. 12-3 at 47.) Plaintiff said he did not prepare meals, do laundry, or go shopping. (*Id.* at 48.) However, he did "[s]ome cleaning around the house," such as "[w]iping down counters [and] some dishes." (*Id.*) Plaintiff said he spent his time "[s]itting around" watching TV and listening to the radio. (*Id.* at 48-49.) He reported that he would get "fatigued and real tired," and had to lie down or rest for an average of an hour each day, although he could be "curled up in bed" because of the pain for up to "half the day." (*Id.* at 52.)

Plaintiff estimated he was able to stand for thirty minutes at one time, and sit for two hours at one time. (Doc. 12-3 at 49.) He believed he could sit for a total of six out of eight hours if he were permitted to take a break every two hours. (*Id.* at 49-50.) Plaintiff said he was able to put cans and boxes of groceries away on shelves above the level of his shoulder. (*Id.* at 50.) He believed the most he was able to lift was fifteen pounds. (*Id.*) Plaintiff said "[a]ny type of reaching, lifting" made his left shoulder pain worse. (*Id.* at 55.)

### C.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the alleged onset date of June 6, 2009. (Doc. 12-3 at 18.) Second, the ALJ found Plaintiff "has the following severe impairments: history of seizure disorder, right and left knee surgeries, bilateral shoulder pain, diverticulitis, mood disorder, remote history of Attention Deficit Hyperactivity Disorder (ADHD) and drug and alcohol abuse." (*Id.*) These impairments did not meet or medically equal a listed impairment, including Listings 1.02, 5.00, 11.02, 12.04, 12.06, and 12.09. (*Id.* at 19-20.) Next, the ALJ determined:

[T]he claimant has the residual functional capacity to perform light work as defined

> in 20 CFR 404.1567(b) and 416.967(b). The claimant has the ability to stand and walk for up to six hours in an eight-hour workday and sit for up to six hours in an eight-hour workday. He can lift 20 lbs. occasionally and 10 lbs. frequently. The claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant can occasionally reach and frequently handle, feel, and finger. The claimant should be precluded from working at heights and around heavy machinery. The claimant is limited to simple, routine, and repetitive work.

(*Id.* at 21.)  With this residual functional capacity ("RFC"), Plaintiff was unable to perform his past relevant work.  (*Id.* at 27.)  However, the ALJ determined there are "jobs that exist in significant numbers in the national economy that the claimant can perform," such as furniture rental clerk, deal accounts investigator, and usher.  (*Id*. at 27-28.)  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 28-29.)

## V. Discussion and Analysis

Appealing the decision to deny her application for benefits, Plaintiff asserts the ALJ erred in assessing the credibility of his subjective complaints.  His only argument on appeal is that the ALJ "failed to provide legally sufficient reasons to reject the testimony of Christopher Zaharides."  (Doc. 14 at 4, emphasis omitted.)  On the other hand, Defendant argues the ALJ's credibility determination was proper and is supported by substantial evidence in the record.  (Doc. 16 at 6-8.)

### B. The ALJ's Credibility Determination

Plaintiff contends the ALJ "improperly assessed his subjective symptom testimony in assessing the residual function capacity." (Doc. 14 at 4.)  When evaluating a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Next, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility.  *Id.* at 1036.  In this case, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms."  (Doc. 12-3 at 22.)  However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible."  (*Id.*)

An adverse credibility determination must be based on clear and convincing evidence where

there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). To support a credibility determination, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

Here, the ALJ considered Plaintiff's daily activities, inconsistencies between his statements and the medical record, and the treatment Plaintiff sought. (*See* Doc. 12-3 at 20-26.) The Ninth Circuit has determined these are relevant factors in assessing the credibility of a claimant. *See, e.g., Fair*, 885 F.2d at 603; *Thomas*, 278 F.3d at 958-59.

### 1. Daily activities

When a claimant spends the day engaged in activities that are transferable to a work setting, a finding of this fact may be sufficient to discredit a claimant's allegations of a disabling impairment." *Morgan*, 169 F.3d at 600 (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). A claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

In *Burch v. Barnhart*, the ALJ explained the claimant's daily activities "suggest that she is quite functional. She is able to care for her own personal needs, cook, clean and shop." *Id.*, 400 F.3d 676, 680 (9th Cir. 2005). Likewise, here, the ALJ noted that Plaintiff was able to "attend his personal care and

could perform household chores such as . . . washing dishes, cooking, and doing laundry."[2] (Doc. 12-3 at 25.) In addition, Plaintiff reported he played poker and games on the computer, which the ALJ found "confirm[ed] that the claimant has sufficient ability to focus and concentrate." (*Id.*) As the Ninth Circuit explained in *Burch*, "Although the evidence of [the plaintiff's] daily activities may also admit of an interpretation more favorable to [her], the ALJ's interpretation was rational, and [the court] 'must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Burch*, 400 F.3d at 680 (quoting *Magallanes*, 881 F.2d at 750). Thus, Plaintiff's daily activities support the adverse credibility determination.

2. Treatment sought and received

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). Further, the Ninth Circuit determined that an "ALJ is permitted to consider lack of treatment in his credibility determination." *Burch,* 400 F.3d at 681. Here, the ALJ concluded "the lack of any treatment for his lower extremities . . . detracts from the credibility of his allegations." (Doc. 12-3 at 24.)

The ALJ noted that while Plaintiff "alleged worsening constant pain" and "testified that his alleged lower extremity pain is exacerbated by standing and walking." (Doc. 12-3 at 24.) However, Plaintiff "had bilateral knee surgeries, which seem[ed] to have resolved his lower extremity problems" did not have "any treatment relating to his knees since the March 2011 follow-up visit" to his last surgery. (*Id.*) Further, the ALJ observed that Plaintiff "has not had an emergency room visit, additional surgery, steroid injections, or significant use of narcotic pain medications since March 2011." (*Id.*) Therefore, the ALJ concluded "the lack of any treatment for his lower extremities . . . detracts from the credibility of his allegations." (*Id.*) These facts were proper considerations in finding Plaintiff lacked credibility. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).

---

[2] The ALJ erroneously cites to Plaintiff's when quoting this information. In his testimony, Plaintiff denied his ability to do these things. Rather, he told Dr. Lewis he performed daily activities including washing dishes, cooking and doing laundry and had hobbies that included playing poker and playing computer games. (Doc. 12-9 at 38)

### 3. Inconsistencies with the medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). In this case, the ALJ found that "[t]he medical evidence cannot be fully reconciled with the severity of impairments and limiting effects alleged by the claimant." (Doc. 12-3 at 22.) Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not credible"). Here, the ALJ found the "evidence of record not only does not support, but actually contradicts" Plaintiff's testimony related to his seizures. (Doc. 12-3 at 24.) Further, the ALJ found the medical record conflicted with Plaintiff's testimony concerning the use of his left arm. (*Id.* at 24-25.)

Specifically, the ALJ noted Plaintiff "testified that he went to hospital after experiencing a grand mal seizure" and suffered from "frequent grand mal seizures." (Doc. 12-3 at 23-24.) However, "nothing in the record supports this testimony." (*Id.* at 23.) Rather, the ALJ found the treatment notes indicated Plaintiff reported only absence seizures, and there was no documentation of "loss of

consciousness, tongue biting, bodily injury, altered mental status, self-wetting, memory loss, and dizziness relating to seizure episodes since February 2011." (*Id.* at 24.)  Further, the ALJ determined "nothing in the record confirms that the claimant has frequently sought treatment at the emergency room or hospital right after he experienced [a] seizure episode." (*Id.*)  Although Plaintiff testified he had "no strength in his upper left extremity" and that "his physician recommended left shoulder surgery," the ALJ did not find "any statement or note in the record regarding the claimant's referral for left shoulder surgery." (*Id.* at 24-25.)  Finally, the ALJ determined "nothing in the medical record corroborates the claimant's allegation of need to rest for at least one hour every day." (*Id.* at 25.)

Because the ALJ carried his burden to identify the medical evidence—or lack thereof—that undermined Plaintiff's complaints, the objective medical record supports the ALJ's adverse credibility determination.

## VI.     Conclusion and Order

For the reasons set forth above, the Court finds, the ALJ carried his burden to articulate clear and convincing reasons for rejecting Plaintiff's credibility, which were "sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas*, 278 F.3d at 958.  Because the ALJ applied the proper legal standards, his conclusion that Plaintiff is not disabled must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Christopher Zaharides.

IT IS SO ORDERED.

Dated:   **April 15, 2015**                          **/s/ Jennifer L. Thurston**
                                                                  UNITED STATES MAGISTRATE JUDGE